UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STEVE ALLAN CHERRY,<br><br>Plaintiff,<br><br>v.<br><br>RONA SIEGERT, J. DOLAN, and JANE and JOHN DOES 1-10,<br><br>Defendants. | Case No. 1:19-cv-00223-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court is Defendants Rona Siegert and Jacque Dolan's Motion for

Summary Judgment. (Dkt. 22.) Plaintiff Steven Cherry filed a response to Defendants'

motion on December 2, 2020. (Dkt. 27.) Cherry filed also a renewed motion for an

extension of time to file a response to Defendants' motion. (Dkt. 28.) Having fully

reviewed the record, the Court finds the facts and legal arguments are adequately

presented in the briefs and record and that oral argument would not further aid the Court.

D. Idaho Loc. Civ. R. 7.1.  For the reasons set forth below, the Court will deny Plaintiff's

Renewed Motion for Extension of Time and grant Defendants' Motion for Summary

Judgment.[1]

---

[1] All parties appearing before the Court have consented to the jurisdiction of a United States Magistrate Judge. *See* Dkt. 16; Fed.R.Civ.P. 72.

## FACTS

Steven Cherry is an Idaho inmate in the custody of the Idaho Department of Correction ("IDOC"), proceeding pro se in this action. (Dkt. 8.) On June 17, 2019, Cherry filed a complaint under 42 U.S.C. § 1983 alleging violations of the Eighth Amendment to the United States Constitution due to Defendants' alleged deliberate indifference to his medical needs.[2] He alleges that, between November of 2018 and the time of filing his complaint in June of 2019, Defendants failed to provide adequate and timely medical care for his cancer diagnosis. During that period, Defendant was incarcerated at Eagle Pass, a Texas overflow facility. He seeks damages from Defendants Siegert and Dolan in their official and individual capacities. (*Id.*)

Rona Siegert is a registered nurse employed by IDOC as the Health Services Director. (Dkt. 22-4 ¶ 1.) In her role as Health Services Director, Siegert oversees IDOC's delivery of contracted healthcare services to inmates, and she is the Level 3 appellate authority for inmate medical grievances. (*Id.* ¶ 2.) Appellate review of inmate grievances includes addressing concerns related to inmates' medical care and coordinating with other medical or administrative staff within IDOC or at its contracted facilities. (Dkt. 22-3, Dolan Decl. ¶ 4.) Her duties do not include direct patient care. (Dkt. 22-4, Siegert Decl. ¶ 2.) Rather, patient care for Idaho inmates housed at contract facilities, like Eagle Pass, is provided by the entity administering the facility. In this case, GEO Group, Inc., provided patient care administration for Idaho inmates housed at Eagle Pass. (*Id.* ¶3.)

---

[2] It its Initial Review Order, the Court allowed Cherry to proceed with his medical deliberate indifference claim under the Eighth Amendment, and dismissed his First Amendment claims. (Dkt. 8.)

Jacque Dolan is also a registered nurse employed by IDOC, working as Health Services Contract Monitor under Siegert's supervision. (Dkt. 22-3 ¶1; Dkt. 22-4 ¶4.) Dolan's responsibilities include monitoring the medical services contract between IDOC and GEO, Inc., and serving as a Level 3 appellate authority for medical grievances filed by inmates housed at Eagle Pass. (Dkt. 22-3 ¶¶2, 3.) As an appellate authority on inmate grievances, she reviews appeals filed by inmates who have completed the Level 1 and Level 2 grievance processes and then researches and responds to an inmate's concerns. (*Id.* ¶4.) Like Siegert, she does not provide direct patient care to inmates. (*Id.* ¶2)

In September of 2018, Cherry was transferred from a prison in Idaho to the Eagle Pass Correctional Facility in Eagle Pass, Texas. (Dkt. 3 at 2.) This facility is a privately-run facility contracted to house Idaho inmates to alleviate crowding in Idaho facilities. (Dkt. 8 at 2.) The Eagle Pass facility is operated and staffed by GEO Group. (Dkt. 22-3 ¶3.) Under the existing services contract between IDOC and GEO Group, GEO Group is responsible for the first $2,500 of medical costs for IDOC inmates. (*Id.* ¶5.) Medical services exceeding that amount require pre-approval by IDOC.

On November 11, 2018, Cherry discovered a golf ball-sized lump in his neck. On November 18, 2018, he was seen by Dr. Musquiz at the Eagle Pass facility. (Dkt. 3 at 3.) At this visit, Dr. Musquiz suspected the growth was cancerous, recommended an ultrasound and later surgery, and wrote an order for an ultrasound. (*Id.*; Dkt. 22-5 at 10.) Cherry asserts that, at this visit, he was told IDOC was informed of his medical diagnosis and the ultrasound order, and that approval of the order would come from IDOC. (Dkt. 3 at 4.)

The ultrasound was not scheduled in the following weeks and, on December 18, 2018, Cherry sent a grievance letter to Siegert describing his need for an ultrasound, his condition, including pain, headaches, and numbness, and requesting immediate approval of the ultrasound order. (Dkt. 3-1.) Cherry claims he was advised by an IDOC deputy warden to write to Siegert, because she was the individual with authority to approve the ultrasound. (Dkt. 27 at 6.) Siegert received the letter and forwarded it to Dolan for follow-up. (Dkt. 22-4 ¶5.)

Following her receipt of the letter on December 30, 2018, Dolan contacted Eagle Pass medical staff on January 2, 2019. (Dkt. 22-3 ¶ 6; Dkt. 22-3 at 8-9.) Cherry also had a follow-up appointment with Dr. Musquiz on January 2, 2019, who wrote a second ultrasound order the same date upon being informed that it had not occurred. Eagle Pass staff informed Dolan that Cherry's ultrasound appointment was scheduled for January 11, 2019. (Dkt. 22-3 at 8.) On January 3, 2019, Dolan advised Cherry that she had confirmed his ultrasound appointment was scheduled, and she advised him to contact her if he was not seen. (Dkt. 22-3 ¶ 8.) The ultrasound was conducted on January 11, 2019, and Dolan received a copy of the report. (Dkt. 22-3 at 14.) Following the ultrasound, the physician at Eagle Pass referred Cherry to Dr. Lindsey for a surgical consult.

In February, Cherry wrote a second letter to Dolan, alleging that the ultrasound was unscheduled and Eagle Pass personnel had been untruthful to both him and IDOC. He stated that he had yet to receive further testing or treatment and had been denied pain medication. (Dkt. 22-3 at 22-24.) He reiterated that he had been told by Eagle Pass staff that approval of further care would come from Idaho. (*Id.*) Dolan did not respond to

Cherry's second letter, because she had received a copy of the ultrasound report, and she was aware he had been referred to Dr. Lindsey for a surgical consult. (Dkt. 22-3, ¶9.)

On March 12, 2019, Cherry was examined by Dr. Lindsey, who reportedly questioned why Cherry had not been seen earlier for the mass discovered four months prior. (Dkt. 27 at 8.) At this visit, Cherry was advised that surgery would be scheduled for May 21, 2019. (Dkt. 22-3 at 18-20; 22-5 at 12.) Surgery was approved by IDOC on March 20, 2019. Dolan received a copy of the radiology report as well as the referral for surgery. (Dkt. 22-3 at 14, 29.)

On May 20, 2019, Eagle Pass medical personnel contacted the hospital to confirm Cherry's surgical appointment for May 21, 2019, but were informed that, due to an error, Cherry was not on the surgical schedule. (Dkt. 22-5 at 12.) His surgery was then rescheduled for July 23, 2019. (*Id.*)

Cherry sent another letter to Dolan on May 31, 2019, regarding the delayed surgery. (Dkt. 22-3 at 26-27.) In this letter, he asserted that IDOC and GEO Group acted in concert to intentionally deny him proper and prompt medical care. Cherry asserts that he was informed by Albert Banda, the Health Services Administrator at Eagle Pass, that IDOC had approved surgery on March 29, four and one-half months after the initial discovery of the cancerous lump. He also claimed that Eagle Pass staff had lied to him on two occasions about whether the surgery had been scheduled.

Dolan responded to the May letter, informing Cherry that she had contacted Eagle Pass staff, and she was informed that the delay was the result of a scheduling error by Dr. Lindsey's office. (Dkt. 22-3 at 35.) Dolan stated that a firm date for surgery had been

verified. The surgery took place on July 23, 2019, without complication. (Dkt. 22-3 at 37-38.)

Cherry later was transferred back to Idaho for further treatment under the care of a local oncologist. (Dkt. 22-3 at 40.) He is currently cancer-free, and the course of treatment is active surveillance. (Dkt. 22-3 at 42-51.) In addition to this lawsuit, he filed a separate action against GEO Group and staff at Eagle Pass in the United States District Court for the Western District of Texas, Del Rio Division. (Dkt. 30.) United States Magistrate Judge Victor Garcia issued a report on May 29, 2020, recommending that Cherry's complaint against GEO Group and the named individual Defendants be dismissed with prejudice. (*Id.*) The report and recommendation was approved and adopted on March 18, 2021 by District Judge Alia Moses. *Cherry v. Geo Grp., Inc.*, No. DR-19-CV-0051-AM, 2021 WL 1398974, at *1 (W.D. Tex. Mar. 18, 2021).

## ANALYSIS

Cherry alleges Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment's proscription against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). He seeks compensatory damages for his court costs, pain and suffering, and emotional and physical distress. Cherry asserts that Defendants violated his rights by knowingly, intentionally, and negligently failing to monitor his condition and communicate with him, and that they possessed sufficient information from which to infer the seriousness of his condition yet failed to monitor or otherwise act to serve his medical needs.

Defendants move for summary judgment on the grounds that Cherry has not stated a cause of action against Defendants in their official capacities and, with respect to the claims against Defendants in their individual capacities, that there are no disputed issues of material fact from which a reasonable jury could conclude Defendants engaged in conduct violative of Cherry's rights under the Eighth Amendment. Defendants raise also the defense of qualified immunity. The Court first addresses Cherry's motion for extension under Fed. R. Civ. P. 56(d), and next reviews Defendants' motion for summary judgment.

## 1.      Summary Judgment Standard

When deciding a motion for summary judgment, the question is whether there exists "no genuine dispute as to any material fact" such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey,* 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party may "cit[e] to particular parts of materials in the record," show that "the materials cited do not establish the ... presence of a genuine dispute," or show that the "adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence sufficient to support a jury verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986). The non-moving party must go beyond the pleadings and show "by [his] own affidavits, or by the depositions, answers to

interrogatories, and admissions on file" that a genuine issue of material fact

exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Should the nonmoving party

show by affidavit or declaration that, for specified reasons, he cannot present facts

essential to justify his opposition, the Court may allow additional time to obtain

documents or take discovery. Fed. R. Civ. P. 56(d). But if, after adequate time for

discovery and upon motion, the nonmoving party fails to make a showing sufficient to

establish the existence of an element essential to that party's case, summary judgment

must be granted. *Celotex,* 477 U.S. at 322.

## 2.      Renewed Motion for Extension of Time

As a preliminary matter, Cherry asks the Court to accept his late-filed response to

Defendants' summary judgment motion, and also requests an additional 90 days to

respond. (Dkt. 28, 29.)

Cherry's response to Defendants' motion was filed two days late. Defendants do

not object to Cherry's late-filed response. (Dkt. 31 at 2.) Accordingly, in the interest of

resolving the matter on the merits, and in the absence of prejudice, the Court accepts the

late filing.

Nonetheless, despite filing a response to the motion concurrently with his request

for a 90-day extension, Cherry claims he requires more time to prepare a response. He

contends COVID-19 restrictions at the prison have impeded his access to legal materials

and legal assistance, and that he needs a copy of both the medical services contract

between IDOC and GEO Group and the policy applicable to the return of inmates to

Idaho for medical treatment. Defendants object to Cherry's request for a second

extension of time to respond to Defendants' motion, noting that he filed a response and disputing the need for further discovery. Defendants represent that Cherry has not asked for depositions and has not served written discovery requests, and contend that the requested documents are not relevant to the issues raised in their motion. Aff. of Phillip J. Collaer ¶3. (Dkt. 31-1.)

Pursuant to Fed. R. Civ. P. 56(d), the non-moving party on a motion for summary judgment may be allowed additional time to take discovery if that party can show, by affidavit or declaration, that he cannot present facts essential to justify his opposition. The party seeking additional time must state specific reasons, and the further discovery sought must be reasonably directed to obtaining facts essential to the opposition to the motion for summary judgment. Fed. R. Civ. P. 56(d).

Cherry has not stated an adequate basis for the Court to grant an extension. The Court previously granted Cherry an extension to prepare his response due to the impact of the pandemic. Cherry filed a response addressing the merits of Defendants' motion, and other than reasserting difficulties caused by COVID-19, he has not otherwise specified why he requires additional time. (Dkt. 26.) Nor has Cherry explained why he is unable, without the above-mentioned contract and policy, to present facts necessary to oppose the motion for summary judgment.[3]

Accordingly, Plaintiff's Renewed Motion for Extension of Time will be denied.

---

[3] Nor do the documents appear material to Cherry's claim. Cherry's Eighth Amendment claim does not implicate the relationship between IDOC and GEO Group.

### 3.     Deliberate Indifference – Official Capacities

Siegert and Dolan argue the claims against them in their official capacities must fail because state employees are not "persons" for purposes of 42 U.S.C. § 1983, and the claims are barred by the Eleventh Amendment. Defendants are correct.

States and state actors are not considered 'persons' under the provisions of Section 1983. *Hafer v. Melo*, 502 U.S. 21, 26 (1991). Suits against state actors "acting in their official capacities" are actually suits against the state, and are barred by the Eleventh Amendment.[4] *Id.* In his or her official capacity, a state actor is not a "person" because an official "assume[s] the identity of the government that employs them." *Id.* at 27. Therefore, when a plaintiff is seeking compensatory damages against a state official, the Court construes the complaint as an individual capacity suit because an official capacity suit for damages would be barred. *See Cerrato v. San Francisco Community College Dist.*, 26 F.3d 968, 973 n. 16 (9th Cir. 1994).

There is no dispute here that IDOC is an instrumentality of the State of Idaho, and that Siegert and Dolan were employed by IDOC at the time of Cherry's medical issues. There is no indication that the State of Idaho has consented to this lawsuit, or otherwise waived immunity. Section 1983 does not abrogate states' Eleventh Amendment

---

[4] The Eleventh Amendment does not bar suits for prospective injunctive relief filed against state officials. *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013) (citing *Ex Parte Young*, 209 U.S. 123 (1908)). Cherry's complaint could be construed to include a claim for injunctive relief, as he sought "prompt medical care, treatment, and surgery." (Dkt 3 at 12.) However, to the extent that Plaintiff may have asserted a claim for injunctive relief, it would be moot because the period related to his Eighth Amendment claims against Defendants was limited to December of 2018 through July of 2019. Cherry's claims do not extend to any conduct by Defendants occurring after July of 2019, and he received care to treat his condition, including surgery.

immunity and, therefore, bars suits against states and state officials. *See Jackson v. Barnes*, 749 F.3d 755, 764 (9th Cir. 2014). Accordingly, Cherry's claims for monetary relief against Defendants in their official capacities are subject to dismissal.

## 4. Deliberate Indifference – Individual Capacities

Cherry brings his deliberate indifference claim against Defendants individually under 42 U.S.C. § 1983. To bring a valid section 1983 claim against prison officials for a violation of the Eighth Amendment's prohibition of cruel and unusual punishment, an inmate must show that prison officials' "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Hudson v. McMillian,* 503 U.S. 1, 8 (1992) (citing *Estelle v. Gamble,* 429 U.S. 97, 103–04 (1976)). Deliberate indifference exists when an official knows of and disregards a serious medical need, or when the official is aware of facts from which an "inference could be drawn that a substantial risk of harm exists," and actually draws such an inference. *Farmer v. Brennan,* 511 U.S. 825, 838 (1994).

However, mere negligent failure to provide care, such as medical malpractice, delayed medical care, or a difference of opinion between medical providers and the inmate is not sufficient. *Estelle,* 429 U.S. at 103. A delay will constitute a violation of the Eighth Amendment only if the delay causes serious harm. *Wood v. Housewright,* 900 F.2d 1332, 1335 (9th Cir.1990).

A deliberate indifference claim must be dismissed if medical personnel have been "consistently responsive to [the plaintiff's] medical needs," and the plaintiff has not shown that the medical personnel had "subjective knowledge and conscious disregard of

a substantial risk of serious injury." *Toguchi v. Chung*, 391 F.3d 1051, 1061 (9th Cir. 2004). Also, "sweeping conclusory allegations will not suffice; the plaintiff must instead 'set forth specific facts as to each individual defendant's deliberate indifference.'" *Fodge v. Reinke*, 2016 WL 1056970 (D. Idaho Mar. 14, 2016) (citing *Leer v. Murphy*, 844 F.2d 628, 634 ((9th Cir. 1988)).

Vicarious liability is generally inapplicable to Section 1983 suits. *Blair v. City of Pomona*, 223 F.3d 1074, 1079 (9th Cir. 2000). To maintain an action for acts taken by a supervisor, the plaintiff must demonstrate that the supervisor either personally participated in decisions regarding the plaintiff's medical care or was aware of actions taken by the supervised employee causing harm to the plaintiff. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011).

### 1) *Defendant Jacque Dolan*

Cherry asserts Dolan negligently and intentionally failed to monitor his serious medical condition and failed to report on his condition to Siegert, her supervisor. He claims Dolan's inaction caused him ongoing pain and suffering, that Dolan knew or should have known his medical condition would cause side effects and pain but instead ignored his medical needs, and that she should have stayed involved by maintaining further contact with both him and the medical staff at Eagle Pass. (Dkt. 3.) He alleges that Dolan has been untruthful throughout this litigation. Cherry suggests also that Dolan knew or should have inferred that he was not being provided with proper medical care.

While not disputing the seriousness of Cherry's condition, Dolan contends that her responsibilities do not include direct patient care and that, in her role as Health Care

Services Monitor, she acted promptly in response to Cherry's grievances. (Dkt. 22-3 ¶¶ 2, 7.) The evidence is undisputed that, after receiving Cherry's December 18, 2018, grievance letter on December 30, 2018, she reached out to Eagle Pass on January 2, 2019, to determine the status of the ultrasound appointment. (Dkt. 22-3 at 8-9.) There is no evidence in the record that Dolan knew of Cherry's medical needs prior to December 30, 2018. She later received a radiology report confirming the ultrasound was conducted on January 11, 2019. *Id.* at 14. In response to Cherry's May 31, 2019 letter, she verified that Cherry's surgery, while rescheduled, was slated to occur on July 23, 2019. *Id.* at 31. (*See also* Dkt. 22-3 at 13-51.)

The record contains correspondence between Dolan and Eagle Pass regarding the ultrasound, as well as copies of the documents Dolan received over the course of Cherry's care, including the radiology report; the surgery referral; the treatment authorization request for the surgery; and the scheduling notes from Eagle Pass detailing the reason Cherry's surgery was rescheduled. None of this evidence supports an inference that the delays in scheduling the ultrasound and surgery resulted from Dolan intentionally withholding approval for treatment. Rather, the only reasonable inference is that, upon being notified of scheduling delays, Dolan acted promptly and decisively to learn the reasons why, and to ensure that Cherry obtained the care required. Cherry received an ultrasound and underwent surgery, and he is now reportedly cancer-free. He is currently under the care of a local oncologist in Idaho who is monitoring his condition.

Cherry's alternate view of the events that occurred between November of 2018 and July of 2019 are not sufficient to show that Dolan intentionally disregarded Cherry's

medical needs. Cherry has not presented facts establishing that a genuine dispute exists, and as such, his claims against Dolan will be dismissed.

### 2) *Defendant Rona Siegert*

Cherry claims Siegert was deliberately indifferent to his serious medical needs because she failed to approve his medical treatment, failed to report to her supervisors about his medical needs, did not appropriately respond to his grievances, and did not properly train or supervise her subordinate, Dolan. (*See* Dkt. 3.)

Cherry points to statements allegedly made by Dr. Musquiz and other Eagle Pass staff as evidence that Siegert was on notice of his medical condition and his need for medical care. He claims to have been told that approval of treatment would come from Idaho, that Eagle Pass was waiting on said approval, and that Siegert was the individual with authority to give the approval. From this, Cherry infers that Siegert was aware of his need for an ultrasound and an appointment with a specialist, and ignored his medical needs. He claims her inaction and negligence led to worsening of his condition and caused him pain over a period of approximately eight and a half months. (Dkt. 27.) In response, Siegert asserts she was not directly involved in Cherry's care, and that she cannot be held liable as Dolan's supervisor unless she was aware that Dolan was engaged in harmful activities causing Plaintiff harm in violation of his rights under the Eighth Amendment. (Dkt. 22-4 ¶ 2.)

The facts before the Court are undisputed that, upon receiving Cherry's December 18, 2018 grievance letter, Siegert promptly forwarded the letter to her delegated employee, Dolan, who received it on December 30, 2018, and followed up with Eagle

Pass on January 2. The only reasonable inference to be drawn from these facts, and the elapsed time between receipt of the letter and action by Dolan, show that Siegert was aware of Cherry's medical needs and the delay that occurred, and that she acted promptly to address both. There is no evidence in the record that IDOC's approval was required before Cherry could receive an ultrasound, which cost less than $2,500, and the undisputed evidence in the record establishes IDOC approved Cherry's surgery without issue. (Dkt. 22-3 ¶5; *see also* Ex. 22-3 at 29.) Siegert was ultimately informed that the ultrasound occurred, the radiology report was received, and the surgery took place—prompting Cherry's return to Idaho for further care. (Dkt. 22-4 ¶¶6, 7.) There is no evidence suggesting Siegert had any further involvement with Cherry's medical care.

Other than arguing that, as a registered nurse, Siegert should have been more involved in Cherry's care, Cherry has not shown that Siegert had additional responsibilities or knowledge of his medical needs. Cherry reiterates his contention that IDOC delayed approval of the ultrasound and bore responsibility for the rescheduled surgery, but he has not presented evidence supporting these assertions beyond stating what he claims staff at Eagle Pass told him. (Dkt. 3-2; Dkt. 27 at 5.)

Additionally, in her role as Dolan's supervisor, Siegert is liable only if she was aware that her employee, Dolan, was engaged in harmful and unconstitutional activities. *See Starr*, 652 F.3d at 1207. As discussed above, Siegert recognized Cherry's medical needs upon being forwarded his grievance letters and she directed Dolan to take action. There is no evidence Dolan did not follow up. Thus, Siegert cannot be liable. The record

thus does not contain facts supporting an inference of deliberate indifference by Siegert, either based upon her own actions or by delegating responsibilies to Dolan.

Cherry has not offered evidence to rebut the chain of events supported by the evidence in the record. Because there is no evidence to suggest either Siegert or Dolan was deliberately indifferent to Cherry's serious medical needs, Plaintiff's claims are, therefore, subject to summary judgment dismissal.

### 3) *Qualified Immunity*

Siegert and Dolan also assert qualified immunity. A threshold question the Court may resolve prior to undertaking a qualified immunity analysis is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the Defendants' conduct violated a constitutional right of the Plaintiff. *Saucier v. Katz,* 533 U.S. 194, 200-01 (2001). Because the Court finds the facts alleged do not establish, as a matter of law, that Defendants' conduct violated Cherry's Eighth Amendment rights, the Court needs not reach the issue of qualified immunity.

## CONCLUSION

The Court concludes that Defendants, in their individual capacities, were not deliberately indifferent to Plaintiff's serious medical needs, and that they are not subject to suit in their official capacities. Therefore, the Court will grant the Defendants' Motion for Summary Judgment.

## <u>ORDER</u>

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)      Plaintiff's Renewed Motion for Extension of Time (Dkt. 28) is **DENIED**.

2)      Defendants' Motion for Summary Judgment (Dkt. 22) is **GRANTED**.

DATED: May 17, 2021

Honorable Candy W. Dale
United States Magistrate Judge